# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JACQUELINE V. HUPP,**
*et al.,*

        **Plaintiffs,**

                              **Case No. C2-07-628**
vs.                             **Judge Edmund A. Sargus, Jr.**
                                **Magistrate Judge Norah McCann King**

**SWITZERLAND OF OHIO**
   **LOCAL SCHOOL DISTRICT,**

        **Defendant.**

## OPINION AND ORDER

Plaintiff, Timothy Hupp ("Timothy"), was born on June 10, 1997. He resides with his parents, Plaintiffs Jacqueline and Timothy Hupp, in Woodsfield, Ohio. Timothy has been diagnosed with attention-deficit hyperactivity disorder ("ADHD") and Asperger's Syndrome, a developmental disorder that manifests traits similar to autism. Children with Asperger's Syndrome have difficulties with social interaction, and have restrictive and fixative patterns of interest in particular topics or behaviors.[1]

This matter began when Plaintiffs filed a due process complaint pursuant to the Individuals with Disabilities Education Improvement Act ("IDEIA"),[2] 20 U.S.C. § 1400, *et seq.*, against

---

[1]    *See infra* (May 24, 2005 Report of Robin F. Muir, Ph.D., A.R., Pls' Exhs. 1 & 2).

[2]    In 2004, Congress re-authorized the Individuals with Disabilities Education Act ("IDEA") as the IDEIA. *See* Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004), effective July 1, 2005. Throughout this Opinion and Order, statutory references will be to the IDEIA, except when quoted as the IDEA in opinions cited by this Court.

Timothy's school, Defendant Switzerland of Ohio School District ("School District"). Following

a five day due-process hearing, an Independent Hearing Officer ("IHO") found that the facts did

not support Plaintiffs' claims that the School District failed to provide a free appropriate public

education ("FAPE") to Timothy and concluded that the District did not violate the IDEIA.

Plaintiffs appealed the decision to the State Level Review Officer ("SLRO"), who upheld the

decision of the IHO.

Plaintiffs now appeal the SLRO's decision under the IDEIA and seek a judicial review of

the administrative due process proceedings. Plaintiffs also assert separate claims under the

Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*, the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Civil Rights Act, 42 U.S.C. § 1983 ("Section

1983"). This matter is before the Court for consideration of Defendant School District's Motion

for Judgment on the Administrative Record on Plaintiffs' claims under the IDEIA and Motion for

Summary Judgment on Plaintiffs' statutory claims.[3] (Doc. #77.) In its consideration of these

motions, the Court found it necessary to remand one discrete issue, (*i.e.*, the Child Find issue),

to the IHO. (Doc. #92.) The Court administratively closed this case and re-opened it once the

administrative review was complete. (Doc. #96.) At that time, Plaintiffs filed their Brief on the

Child Find Issue Remanded by the Court (Doc. #99) and the School District filed its Brief in

---

[3]        The parties previously agreed to a procedure wherein the Court would initially rule on
Defendant's Motion as it relates to Plaintiffs' statutory claims under the Rehabilitation Act, the ADA and
Section 1983, and would later provide a separate decision on Defendant's Motion for Judgment on the
Administrative Record on the IDEIA claims. Because the Court concludes that the federal statutory
claims are inextricably interrelated with Plaintiffs' claims under the IDEIA, this Opinion and Order
provides a single, comprehensive ruling on all of Plaintiffs' claims as raised in Defendant's Motion. The
Court examines Plaintiffs' claims under the IDEIA first because resolution of Defendant's Motion for
Judgment on the Administrative Record facilitates the resolution of the statutory claims.

Opposition to Plaintiffs' Brief Regarding Child Find (Doc. #100). For the reasons that follow, Defendant's Motion for Judgment on the Administrative Record is **GRANTED**; Defendant's Motion for Summary Judgment is **GRANTED**. (Doc. #77.)

I.

## A.    Factual Background

Timothy attended first grade in the Switzerland of Ohio School District during the 2003-2004 school year in Ms. Rita Stoehr's classroom. Timothy was retained in the first grade for the following 2004-2005 school year, and remained in Ms. Stoehr's class.[4]

In the Spring of 2005, Ms. Stoehr asked one of the other teachers in the building, Ms. Kassie Anderson, a specialist in the school with extensive experience with autistic children, to observe Timothy.[5] After discussing the matter with Ms. Anderson, Ms. Stoehr recommended to Ms. Hupp that she take Timothy for an evaluation by a private psychologist, Dr. Muir. In a report dated May 24, 2005, Dr. Muir informed Ms. Hupp that Timothy exhibited poor social skills, was

---

[4]     The Court has thoroughly reviewed and independently examined the evidence submitted at the administrative level. Where appropriate, the Court defers to the administrative fact-finding. Deference is appropriate "because 'federal courts are generalists with no expertise in the educational needs of handicapped children,' and will benefit from the fact-finding of a state agency with expertise in the field." *Doe v. Smith*, 879 F.2d 1340, 1343 (6th Cir.1989) (quoting *Crocker v. Tennessee Secondary Sch. Athletic Ass'n*, 873 F.2d. 933, 935 (6th Cir. 1989)). Based on its independent review, the Court finds the following facts proven by a preponderance of the evidence. Where indicated, the Court has supplemented the factual background with evidence disclosed during the discovery period related to Plaintiffs' statutory claims.

[5]     Larry Koslik, who was principal of the school at the time, recalled that Ms. Stoehr had talked with him about asking Ms. Anderson to observe Timothy, but he himself did not personally initiate a formal evaluation of the child. (Tr. 198.) He noted that the District's practice had been to finish referrals by February of the school year, so that evaluations could be completed and individualized education plan for students with disabilities in place by the new school year. He also noted that the intervention teams are set up with teachers, who do not meet in the summertime. (Tr. 203-04.)

easily distracted, aggressive and hyperactive. Dr. Muir opined that Timothy possibly had Asperger's Syndrome. Some time at the end of the school year in 2005, Larry Koslik, the district's special education director, received Dr. Muir's report regarding Timothy.[6]

On July 27, 2005, Ms. Hupp took Timothy to another physician for an evaluation. On August 10, 2005, Dr. Khalique formally diagnosed Timothy with ADHD and Asperger's Syndrome. He recommended a change in Timothy's medication as it related to ADHD, counseling and a "1-1 Aide in classroom for behavior control and academic achievement." (Pl's Exh. 41, Exh. 2.) Ms. Hupp shared Dr. Khalique's report with school officials.[7]

On August 12, 2005, Mr. Koslik contacted Timothy's teacher to prepare a referral to the school's Intervention Assistance Team. After receiving the referral, the school psychologist, Dr. Constance Brady, conducted a multi-factored evaluation ("MFE") just prior to the start of the 2005-2006 school year, which included a developmental history from Ms. Hupp, standardized tests and other diagnostic evaluations. On August 25, 2005, Jacqueline Zink conducted a speech-language evaluation[8] and other officials conducted fine and gross motor skills assessments of

---

[6]    In her report, Dr. Muir did not make any recommendations regarding Timothy's education or classroom environment. Although she opined during the due process hearing that a one-on-one aide would "probably" be beneficial for Timothy, (Tr. at 689), she testified that she had no particular knowledge about how an aide system could be structured in a school district. (Tr. 690), and that she did not view her position as a child psychologist to make specific recommendations to a school district regarding academic accommodations. (Tr. 692.)

[7]    During the 2004-2005 school year, Mr. Willis was the Special Education Director for the School District. Mr. Koslik became the Special Education Director after that school year, in August 2005. Although Mr. Willis had previously spoken to Mr. Koslik about Dr. Muir's report regarding Timothy, Mr. Willis did not pass on any further information when Mr. Koslik became Special Education Director.

[8]    Mr. Koslik previously contacted the district's substitute speech and language pathologist, Kelli Sherwood, and asked her to begin evaluating Timothy, and to write speech and language goals for the IEP. Ms. Zink, a speech and language pathologist, subsequently completed an evaluation of

Timothy. Dr. Brady prepared an Evaluation Team Report ("ETR") summarizing her assessments and all of the evaluations. The school district ultimately determined that Timothy had a disability of "Autism-Asperger's Disorder," as set forth on the ETR.

After the assessments were complete, on August 29, 2005, the School District's special education team and Ms. Hupp met to discuss the results of the Timothy's MFE and to prepare an individual education program ("IEP"). The IEP team, including Ms. Hupp, discussed the issue providing Timothy with an aide during unstructured times, but determined that he did not require a one-on-one aide for the entire school day.

Ms. Anderson, a member of Timothy's IEP team and the school district's autism specialist formalized the IEP after the August 29, 2005 meeting and gave Ms. Hupp a copy of it that day. Along with providing goals and benchmarks addressing appropriate reactions in social situations, the IEP provided that (1) Timothy would receive social skills training with his case manager, Ms. Gallagher, for 15 minutes at the end of each school day; (2) Ms. Anderson would intervene with Timothy in the event of need, although no behavioral plan was developed; (3) Ms. Anderson would conduct observations of Timothy during the first 4 ½ weeks of school to better understand his behavior.

The participants in the IEP conference also agreed that an aide would be provided for Timothy during unstructured times, such as lunch, music and gym class. The agreed-upon aide system was not included in Timothy's IEP. The school, however, began the process of providing

---

Timothy's skills in this area. As described more fully, *infra*, speech and language goals and objectives were actually missing from Timothy's 2005-06 IEP, but were added in early January 2006 by Ms. Christman when she returned from maternity leave, in anticipation of Timothy potentially returning to school again in 2006 after having been home-schooled by Ms. Hupp for the remainder of the 2005-2006 school year. (Tr. 227-28.)

an aide for Timothy in the first days of Timothy's second-grade year.

The next day, on August 30, 2005, Timothy began second grade in Ms. Sally Ackerman's class. At the end of the first day of school, Ms. Gallagher met with Timothy for 15 minutes, as prescribed by the IEP. Ms. Hupp told Ms. Gallagher at the end of that first school day that she was considering home schooling Timothy, and noted that she was angry about an incident involving a student passing over Timothy when distributing papers.[9]

Timothy's second-grade teacher, Ms. Ackerman, maintained a warning system for her students before imposing any discipline. If undesirable behavior continued after verbal warnings, students could lose privileges. Some students who misbehaved lost recess time and were required to stand on a map of the United States which was painted on the outside playground. During the early days of the school year, Ms. Ackerman disciplined Timothy for bad behavior by making him stand on the map during his recess. Ms. Stoehr, Timothy's former first-grade teacher, observed him standing on the outside map approximately five times, and once for as much as 15 minutes. When Ms. Hupp learned that Ms. Ackerman was disciplining Timothy in this manner, she complained to school officials that it was inappropriate punishment and abusive for a child with autism.

On September 14, 2005, Timothy hit another student on the wrist with a pair of scissors. Ms. Ackerman sent Timothy to the principal's office. Ms. Anderson successfully intervened with Timothy according to the procedures of his IEP. On that same day, Ms. Hupp requested a meeting to address Ms. Ackerman's discipline of Timothy. During the meeting, held on

---

[9]     Ms. Ackerman observed that Timothy generally interacted well with the other children most of the time, but he had kicked a girl when she skipped him while passing out papers on the first day of school.  (IHO, ¶ 34; Tr. 166-67.)

September 15, 2005, the day after the incident involving the scissors, Ms. Hupp and school officials discussed Timothy's punishment and Ms. Hupp's assertion that it was abusive to place her son on the map during recess. The meeting degenerated, and Ms. Ackerman allegedly said that Timothy should be placed in the multi-handicapped classroom among more severely disabled children. Ms. Ackerman denies she made this statement.

Ms. Hupp decided to withdraw Timothy from school and to teach him herself from home. Although Timothy did not attend school after the September 14, 2005 incident involving the scissors, Ms. Hupp officially withdrew him from school on September 22, 2005 and signed a Home Education Notification Form. Ms. Hupp executed an IEP form revoking consent for special education services. Mr. Koslik agreed to provide to Ms. Hupp books that the School District used for the second grade curriculum.[10]

On October 27, 2005, after Ms. Hupp removed Timothy from the district to home school him, someone made an anonymous complaint against the Hupp family regarding child abuse or neglect to the Monroe County Department of Job and Family Services.[11] According to Ms. Hupp's testimony, the complainant alleged that the Hupp's "house was always dirty and it had broken glass all over the floor." (Tr. 601.) Plaintiffs maintain that someone from the School District filed this baseless complaint against them as retaliation for exercising their rights under the IDEIA.

The child neglect complaint loomed over the Hupps through the holidays at the end of

---

[10]    Although the District agreed to provide books from the second-grade curriculum, Ms. Hupp did not get a set of "decodable readers" that the second-grade teachers received.

[11]    The Director of the Monroe County Department of Job and Family Services, Vaughan Smith, is the School District's Special Education Director, Larry Koslik's brother-in-law.

2005. Ms. Hupp repeatedly called the agency, but did not receive notice that the claim had been

dismissed until January 23, 2006 when she went to the Director's office and demanded to speak

with him. The Director's assistant gave Ms. Hupp a letter that confirmed that the agency had

found no evidence of child abuse or neglect and disposed of the claim as unsubstantiated. That

letter was dated two months earlier, November 22, 2005.

Ms. Hupp was understandably distressed until the child abuse claim was dismissed as

unsubstantiated. During this period, Ms. Hupp was having difficulty home-schooling Timothy

because she was distraught about the investigation and unable to fully concentrate. In January

2006, she contacted the School District about re-enrolling Timothy. Ms. Hupp and Mr. Koslik

discussed the need to develop an new IEP for Timothy, should he return to the school.[12] The

parties dispute whether Ms. Hupp wanted to re-enroll Timothy in first grade, his former teacher's

classroom, for the third time.[13] Both Ms. Hupp and Mr. Koslik spoke to DeeDee Dransfield, the

autism specialist for Southeast Ohio Special Education Resource Center in Athens, Ohio. Ms.

Dransfield made suggestions to improve the 2005-2006 IEP. Timothy, however, did not return

to the District and remained at home for school for the rest of the academic year.

Ms. Hupp arranged for Timothy to have additional evaluations completed at Columbus

---

[12]     At this point, Ms. Christman, the District's speech pathology specialist who had just returned from maternity leave, developed speech therapy goals.

[13]     Ms. Hupp testified that she did not tell Mr. Koslik that she wanted her son to be placed back into first grade. (Tr. 606.) Instead, she testified that she was concerned generally about bringing Timothy back into that school because he had reacted so negatively during a visit there to pick up school books. (*Id.*) She later testified in her deposition that she waned Timothy to spend a few weeks in Ms. Stoehr's first grade class to re-acclimate him to school, but never said she wanted him to spend the rest of the year there. (Hupp Dep. 120-21.) Mr. Koslik, on the other hand, testified that he believed that Ms. Hupp had made a request to place Timothy back into Ms. Stoehr's classroom in the first grade, and that school officials did not think enrolling Timothy in the first grade was either legally permissible or a good idea. (Tr. 261-64, 300-304.)

Children's Hospital. On February 7, 2006, Dr. Nathan Henninger performed a psychological assessment of Timothy, and confirmed that he had an autistic disorder. Dr. Henninger recommended that he return to school with the assistance of an IEP. He included suggestions for the IEP and noted that it would be important for Mr. and Ms. Hupp work closely with the School District to develop an appropriate plan.

> It will be important to incorporate curriculum modifications, environmental modifications, and behavior management strategies. Educators should look for ways to structure the environment to promote success and anticipate problem situation in order to avoid them. Punitive feedback should be limited as much as possible. Instead, positive reinforcement strategies should be used to promote wanted behaviors.
>
> . . . . Though he should be included in regular education classes for most academic and social programming, Tim's unique deficits will require directed instruction by a trained para-professional. Without intensive education of his deficit areas Tim is at risk for future learning problems as well as social and behavioral difficulties.

(Henninger Rpt., at p. 6.) Dr. Henninger recommended that the Hupps continue to pursue speech and language services for Timothy's language difficulties, and occupational and physical therapy evaluations. Dr. Henninger also opined that Timothy would benefit from a classroom aide for many activities both in the class and during unstructured time. (*Id.* at 6-7.) In his written report, however, Dr. Henninger did not expressly recommend that Timothy have a dedicated, full-time one-on-one aide.[14]

In May 2006, Ms. Hupp re-enrolled Timothy at Woodsfield Elementary for the 2006-07

---

[14] In his November 27, 2006 deposition, however, Dr. Henniger testified that his expectation or desire with respect to an aide was that a specific person initially be assigned exclusively to Timothy in the classroom setting, such that the person would have no other responsibilities at all concerning any other children. (Henninger, M.D., Dep. at 43.) Dr. Henninger thought that, as Timothy was increasingly successful, that the support of the aide could be withdrawn to provide less and less direct support. (*Id.*)

school year. Mr. Koslik attempted to schedule an IEP meeting for June. Timothy had been scheduled for several months for medical testing on the proposed day, so Ms. Hupp requested a different day. He was subsequently diagnosed with Arnold-Chiari Malformation, an abnormality in the formation of the brain stem.

Mr. Koslik contacted Ms. Dransfield for assistance in drafting an IEP. Although Ms. Dransfield believed that Timothy would be entering the third grade when he returned, she developed an IEP to work on his "access skills," which would allow him to benefit from the instruction provided, and could be used regardless of whether Timothy was in second or third grade. (Tr. 517-18, 528.) The IEP provided Timothy with services including but not limited to a classroom aid, a one-on-one aide for unstructured times, picture schedules, social skills training, behavior intervention, reduced assignments, a study carrel, sensory diet, training for the classroom aide and teacher, and progress monitoring. (Hearing R's Exh. 5.)

On July 20, 2006, Mr. and Ms. Hupp, together with Mr. Koslik, Dr. Brandy, Larry Elliot (assistant principal), Ms. Wiggins (third grade teacher), Ms. Christman (speech and language pathologist), and Ms. Stoehr participated in an IEP meeting. Ms. Hupp requested occupational and physical therapy evaluations, and was given permission forms. The School District agreed to modify Timothy's physical education program in order to protect against injury to his brain due to his Arnold-Chiari Malformation.

At the request of Ms. Hupp, Timothy was permitted to repeat the second grade. Ms. Stoehr, who had been teaching first grade for more than 20 years, agreed to change from a first to second grade teacher in order to accommodate Ms. Hupp's request that she be Timothy's teacher. The School District also carpeted Timothy's classroom and provided a quiet room for

him at Ms. Hupp's request.

The parties attended a second IEP meeting on August 23, 2006. Ms. Hupp executed the permission forms for occupational therapy and physical therapy evaluations, but refused to sign the IEP. Her chief objection was that the School District would not provide a one-on-one qualified aide, and instead wanted to use a classroom aide and an aide for Timothy's unstructured time. DeeDee Dransfield, who observed Timothy for an extended period of time in the classroom, opined that he would benefit more from a classroom aide than an individual one-on-one aide who is with him all of the time because she believed a full-time aide would undermine strategies that ultimately had the potential of increasing his independence. Although some of Timothy's medical providers recommended a one-on-one aide, Ms. Dransfield and Ms. Anderson were the only professionals with expertise in autism who actually observed Timothy in the classroom prior to making recommendations regarding an aide. (Tr. 463-470; Defs' Exhs. 53, 54.)

The proposed IEP for 2006-2007 contains a thorough discussion of Timothy's then-levels of performance, and describes his strengths and weaknesses. The IEP addresses his disabilities, identified as Asperger's Syndrome, ADHD, Arnold-Chiari Malformation, and issues related to his medications. (Pl's Exh. 24; Defs' Exh. 5.) The IEP contains measurable goals and short-term objectives. It details how Timothy's progress will be measured and how his parents will be informed regarding his performance. The IEP provides that a classroom aid will be dedicated to Timothy's teacher's classroom for 6½ hours per day. The aide also would be one-on-one with Timothy during unstructured times to facilitate social interaction. Ms. Dransfield, the autism specialist, was to consult one time per grading period. The IEP also includes an explicit behavior intervention plan. (*Id.*)

Ms. Hupp never signed or otherwise gave consent for the implementation of the 2006-2007 IEP because a one-on-one aide was not provided for Timothy.[15] The School District offered to implement the parts of the IEP to which she agreed, but Ms. Hupp has not consented. Parental consent is required before a school district can implement an IEP. 34 C.F.R. § 300.300(b)(7).

## B.      Administrative Conclusions

Plaintiffs filed a due process complaint pursuant to the IDEIA against Defendant School District. The IHO found that the School District provided a FAPE to Timothy and concluded that the District did not violate the IDEIA.

### 1.      2005-2006 School Year

The IHO found that the 2005-2006 IEP proposed by the School District contained a specific statement of Timothy's performance levels, his short-term and long-term goals, educational and other services to be provided, and criteria for evaluating his progress. She found that the IEP proposed by the School District was offered in the least restrictive environment, was unique, individualized for Timothy and designed to meet his unique needs. The IHO noted that some of the services the School District and Ms. Hupp agreed to provide, such as giving Timothy preferred seating, parental notification of disciplinary problems, and a system of aides during unstructured times, were not specified in the IEP. The IHO found that the School District, nevertheless, provided these services to Timothy. The IHO also found that, despite the fact that these agreed-to services were not included in the IEP, the School District was in the process of providing them, including the aide system. According to the IHO, although the School District was in the process

---

[15]      During the 2006-2007 school year, Ms. Hupp has served as Timothy's unpaid one-on-one aide. Ms. Stoehr believed that Ms. Hupp's presence in the classroom was beneficial. (Tr. 72-73.)

of providing FAPE, the 2005-2006 IEP document itself was incomplete, because it did not include some of the agreed-upon services, although they were being provided. She concluded, however, that Ms. Hupp's withdrawal of Timothy just two weeks after school began inhibited the ability of the school officials to fully implement an IEP. Taking account of the services being provided by the School District, but not specifically designated in the IEP, the IHO concluded that the 2005-2006 IEP proposed by the School District was reasonably calculated to confer educational benefit on Timothy.

### 2. **2006-2007 School Year**

The IHO found that the 2006-2007 IEP developed by the School District was unique, individualized for Timothy, and designed to meet his unique needs. She also found that the IEP proposed by the School District contains a specific statement of Timothy's performance levels, short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating his progress. The IHO concluded that the IEP was offered in the least restrictive environment, and was reasonably calculated to confer an educational benefit on Timothy.

### 3. **Appeals to State Level Review Officer and this Court**

Plaintiffs appealed 22 of the IHO's 72 findings of fact, and 7 of her 26 conclusions of law. They also objected to the IHO's alleged failure to make specific findings of fact on procedural issues, including whether the School District: (1) performed a timely and full evaluation of Timothy when a disability was first suspected; (2) advised the Hupps of the multi-factor evaluation meeting of August 29, 2005; (3) timely advised the Hupps of their procedural right under the IDEIA for the 2005-2006 school year; (4) obtained appropriate consent for revocation of special education services in September 2005 or failed to permit Timothy to return to school in January

-13-

2006; (5) provided all books necessary for home schooling; and (6) illegally added to the 2005-2006 school year IEP without notice to or participation in the decision by the Hupps. Plaintiffs also alleged that the IHO refused to admit relevant testimony regarding preexisting animosity between the School District and Ms. Hupp. The SLRO upheld the decision of the IHO as to all of the objections to the findings of fact and conclusions of law. The SLRO also found that the IHO did address the other procedural matters raised by the Plaintiffs and affirmed her conclusions regarding them.

Thereafter, Plaintiffs filed their Complaint in this Court seeking an administrative review of the decision of the SLRO, and raised additional statutory claims under the Rehabilitation Act, the ADA, and Section 1983.[16]

## II.

Two standards of review apply in this case. Count I of the Complaint involves an appeal under the IDEIA and seeks judicial review of the administrative due process proceedings. Plaintiffs' claims under the IDEIA and Defendant's Motion for Judgment on the Administrative Record are subject to a modified *de novo* standard of review, as set forth more fully below. As for Plaintiffs' claims under the Rehabilitation Act, the ADA and Section 1983, the traditional

---

[16]     The Court notes that the IDEIA permits a party to proceed concurrently under these statutory frameworks. As set forth at 20 U.S.C. § 1415(l):

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 *et seq*.], title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 *et seq*.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

standard of review for a motion for summary judgment applies under Federal Rule of Civil Procedure 56.

## A.    Motion for Judgment on the Administrative Record on Plaintiffs' IDEIA Claims

The IDEIA provides that a party aggrieved by the findings and decision of an administrative hearing officer has a right to bring a civil action in federal court. 20 U.S.C. § 1415(i)(2). Under the terms of the statute, the Court must receive the record of the administrative proceedings, hear additional evidence if the parties make such a request, and, basing its decision on the preponderance of the evidence, grant appropriate relief.[17] *Id.*

"Under IDEA, the district court uses a 'modified *de novo*' standard for reviewing state administrative determinations. This means that the district court should perform a *de novo* review, but it should give due weight to the state administrative proceedings in reaching its decision." *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 386 (6th Cir. 1998) (internal quotation marks and citations omitted); *N.L. ex rel. Ms. C. v. Knox County Sch.*, 315 F.3d 688, 692 (6th Cir. 2003). The Court must make "independent decisions" based on the preponderance of the evidence, but also should give "due weight" to the determinations made during the state administrative process. *See Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S., 176, 206 (1982). Although reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe v. Metropolitan Nashville Pub. Schs.*, 133 F.3d at 387, neither may the district courts "substitute their own notions of sound educational policy for those of the school authorities which they review." *Doe v. Bd. of Educ. of Tullahoma City*

---

[17]    The parties did not request that addition evidence be adduced with respect to Plaintiffs' administrative claims under the IDEIA. The parties engaged in discovery with respect to Plaintiffs' statutory claims.

*Schs.*, 9 F.3d 455, 458 (6th Cir. 1993) (quoting *Rowley*, 458 U.S. at 206). The Court should give due deference to the fact findings made during the administrative process, "particularly when educational expertise is essential to the findings." *N.L. ex rel. Ms. C. v. Knox County*, 315 F.3d at 692. "[A]dministrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich v. Board of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 567 (6th Cir. 2000).

**B.     Motion for Summary Judgment on Plaintiffs' Statutory Claims**

The procedure for considering whether summary judgment is appropriate is set forth in Federal Rule of Civil Procedure 56(c), which provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530

U.S. 133, 50 (2000).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the

hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present

affirmative evidence in order to defeat a properly supported motion for summary judgment.'"

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989) (quoting *Liberty Lobby*, 477

U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order

to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to

merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting

*Matsushita*, 475 U.S. at 586). The nonmoving party has an affirmative duty to direct the court's

attention to those specific portions of the record upon which it seeks to rely to create a genuine

issue of material fact.

## III.

### A.    Motion for Judgment on the Administrative Record - Count I Under IDEIA

Under the basic tenets of the IDEIA, children with disabilities must receive a FAPE

designed to meet the individual child's needs. *Burilovich,* 208 F.3d at 565. In exchange for

federal funding, the IDEIA requires states to identify, locate, and evaluate "all children residing

in the State who are disabled . . . and who are in need of special education and related services

. . . ." 20 U.S.C. § 1412(2)(C). States must provide these disabled children a FAPE, 20 U.S.C.

§ 1401(a)(18).[18] School districts that receive funds under the IDEIA must create an IEP for each

---

[18]    20 U.S.C. § 1401(9) defines the term"free appropriate public education" as special
education and related services that--

child with a disability.  20 U.S.C. § 1414(a)(5); *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2005). To provide a FAPE, a school district must offer an individualized program of special education and related services designed to meet the eligible student's unique needs. *Rowley*, 458 U.S. at 206. An IEP must "contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Id*. (quoting *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 762 (6th Cir. 2001)).

A school district must comply with both the procedural and substantive components of the IDEIA.  In determining whether the School District denied Timothy a FAPE, the Court must examine whether "the State complied with the procedures set forth in the Act," and second, whether the IEP was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id*. at 207.

## 1.    **Procedural Violations**

The IDEIA has several provisions requiring school districts to follow specified procedures when developing and implementing an educational program for a disabled student.  Plaintiffs

---

(A)    have been provided at public expense, under public supervision and direction, and without charge;

(B)    meet the standards of the State educational agency;

(C)    include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D)    are provided in conformity with the individualized education program required under section 1414(d) of this title.

allege that the School District committed the following procedural violations of the IDEIA: (1) it did not engage in a timely and full evaluation of Timothy when a disability was first suspected; (2) it did not appropriately advise Mr. and Ms. Hupp of the MFE meeting or IEP meeting of August 29, 2005; (3) it did not timely advise the parents of their procedural rights under the IDEIA; (4) it did not obtain informed consent for the revocation of special education services in September 2005 and failed to rescheduled an IEP meeting or permit Timothy to return to school in January 2006; (5) it failed to provide all books necessary for home schooling for the remainder of 2005-2006 school year; and (6) it illegally added to the 2005-2006 IEP without notice to or participation of Mr. and Ms. Hupp.

"A court should 'strictly review an IEP for procedural compliance,' although technical deviations will not render an IEP invalid." *Deal,* 392 F.3d at 854 (quoting *Dong v. Board. of Educ.,* 197 F.3d 793, 799 (6th Cir. 1999)). A school district's failure to comply with the procedural requirements of the IDEIA is not a *per se* violation of the Act and only constitutes a denial of a FAPE "if such violation causes substantive harm to the child or his parents." *Knable,* 238 F.3d at 765. Substantive harm occurs when a procedural violation "seriously infringe[s] upon the parents' opportunity to participate in the IEP process." *Id*. (citations omitted). Procedural violations that deprive an eligible student of an IEP or result in the loss of an educational opportunity will also constitute a denial of a FAPE. *Id*. at 766; *see* 20 U.S.C. § 1415(f)(3)(E) (describing matters upon which a hearing officer may find a child did not receive a FAPE due to procedural inadequacies).

          a.    *Initial Evaluation*

Plaintiffs first allege that the School District did not timely and fully evaluate Timothy

-19-

when a disability was first suspected.  Throughout the administrative due process hearings, and in their Complaint, Plaintiffs alleged that the School District "failed to properly evaluate Timothy for appropriate educational services and placement. . . ."  (Compl., ¶ 14.)  In their Memorandum in Opposition, Plaintiffs assert, for the first time, that the School District violated the "child find" provisions of the IDEIA, 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. §§ 300.11(a) & (c), by failing to make an earlier referral regarding Timothy's potential disability.

> The IDEA imposes a "child-find" requirement on the states: their schools must have policies and procedures in place to identify, locate, and evaluate children with disabilities who need special education and related services.  34 C.F.R. § 300.111(a)(1).  Even children who are only suspected of having a disability, although they are progressing from grade to grade, are protected by this requirement.  34 C.F.R. § 300.111(c).

*Board of Educ. of Fayette County, Ky. v. L.M.*  478 F.3d 307, 313 (6th Cir. 2007).  A school district violates the child find provisions of the IDEIA only if "school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (adopting standard first articulated in *Clay T. v. Walton County Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997)).

This Court previously determined that it could not conduct the review related to the child find issue that is required by the IDEIA because the issue was not addressed by the IHO.  (Doc. #92 at 5.)  The Court, therefore, remanded this issue to the IHO for decision, which it has now rendered.  (Decision from IHO on Remand; Doc. #93-1).  In that decision, the IHO found "that the school district did not violate its child find responsibilities under the IDEIA." (*Id.* at 1.)  The IHO's decision was appealed to the SLRO, who affirmed the IHO's decision. (Doc. #93-2.)

In the Remanded Findings of Fact ("RFOF"), the IHO determined that when Timothy's teacher, Ms. Stoehr, spoke to principal Mr. Koslik in early 2005, she indicated she was implementing interventions with Timothy and that the interventions were successful. (RFOF 14-16, 19, 25-26; Tr. 193-196, 339, 1155) ("It would be expected for a teacher to first try his or her own interventions in the classroom, initiating a referral for intervention team assistance later if that proved necessary."). The IHO found that Ms. Stoehr's determination to try interventions with Timothy rather than make an immediate referral to the Intervention Assistance Team was fully consistent with state law in force at the time and did not violate any child find requirements. (Remanded Conclusions of Law at 11-12.) In Ohio in 2005,[19] school districts were required to provide interventions to resolve concerns for students prior to conducting a full and individual evaluation. *Id.* (citing O.A.C. 3301-51-06(A)(2) ("each school district shall provide interventions to resolve concerns for any preschool or school-age child who is performing below grade-level standards")). This requirement was concomitant with the child find obligations under both Ohio and federal law. *Id.* (citing 34 C.F.R. § 300.111; O.A.C. 3301-51-03(A)). With this statutory framework in place, the School District's obligation was to identify children suspected of having a disability, provide interventions to the child, and then determine whether to conduct an evaluation based on the results of those interventions. To fulfill this requirement, Mr. Koslik testified that Ms. Stoehr was responsible for documenting her interventions with Timothy. (Tr.

---

[19]Plaintiffs' Brief references the Administrative Code as it existed on and after July 1, 2008, referencing subsections of O.A.C. 3301-51-06 that did not exist until that date and subsections that are different from the ones applicable to the case at bar. Notably, the time-frames Plaintiffs seek to rely upon were different prior to July 1, 2008. *See* former O.A.C. 3301-51-06(F)(2).

196). The use of interventions by Ms. Stoehr demonstrates that the School District was addressing Timothy's problems. Because child find was not an issue raised in the due process complaint, there was no testimony or evidence produced at the hearing regarding the specific interventions Ms. Stoehr provided to Timothy in the spring of 2005. The only detail that is clear is that interventions, in whatever form they took, were indeed provided and that Timothy was academically successful.

The fact that Ms. Stoehr successfully utilized interventions with Timothy during the second semester of the 2004-2005 school year obviates a finding that the School District ignored signs of Timothy's disability, or had no rational justification for not referring him for an evaluation immediately upon suspicion of disability. In *Fayette County*, the court determined that there was no child find violation for the student's kindergarten and first grade years because the school district provided the student with additional services even though he had not been identified as disabled under the IDEIA. 478 F.3d at 314.

Also, there neither was nor is a time-line set forth in either Ohio law or the IDEIA for when an evaluation must occur upon suspicion of a disability, or how long a district is required to utilize interventions or utilize the screening process before conducting an evaluation, other than currently a general admonition that interventions may not be used to "delay unnecessarily" a child's evaluation. *See* O.A.C. 3301-51-06(A)(3), effective July 1, 2008. The school in *Fayette County* was found to have violated the IDEIA's child find provisions by not referring the child for an evaluation over a two-year period covering the student's second and third grade years, but not during kindergarten or first grade when interventions were initially provided. The court cautioned that school districts should not rush to judgment in referring students for IDEIA evaluations due

to the lack of uniform development in very young students. *Id.* at 313-314. In second and third grade, the student began experiencing "severe academic problems" but no evaluation occurred. *Fayette County*, 478 F.3d at 311. The evaluation process did not even get underway for the student until the fall of his fourth grade year. In September his guardian notified the school district that the student had been diagnosed with ADHD. The principal referred the student for an evaluation in November, but a determination to evaluate was not made until February. The evaluation itself was completed in April, and an IEP meeting was not held until May, essentially causing the student to be deprived of special education services for a third school year. *Id.* at 314. These events are extreme in comparison to the events that occurred in the instant action.

Here, sometime around the end of the 2005 school year, Ms. Hupp provided a letter from private psychologist Dr. Muir regarding a possible diagnosis of Asperger's Syndrome for Timothy. (Ex.P-1, R- 25). Ms. Hupp does not recall giving the letter to Mr. Willis or Mr. Koslik, and Ms. Stoehr does not recall how, or exactly when, she saw the document. (Tr. 540, 712, 1157-1158). After receiving the letter, however, Ms. Stoehr did not make a referral to the Intervention Assistance Team, but she did speak with Mr. Koslik sometime around June 4, 2005, after the school year had ended. (Tr. 1158). She does not believe that Mr. Koslik had seen Dr. Muir's letter at the time she spoke with him. (Tr. 1158-1159).

Assuming Dr. Muir's letter was a triggering event in terms of conducting an initial evaluation, and qualified as Ms. Hupp's consent for said evaluation, the School District had 90 days from the time of that event to develop an IEP for Timothy should he be determined eligible under the IDEIA. 20 U.S.C. § 1414(a)(1)(C)(i); 34 C.F.R. § 300.323(c)(1). Assuming Dr. Muir's letter was received by the School District on May 26, 2005, being dated two days earlier,

-23-

the School District would have had until August 24, 2005, to have an IEP in place for Timothy.

The School District held an IEP meeting for Timothy on August 29, 2005, a delay of five days.

If either the June 4, 2005 date noted by the IHO on remand or Ms. Stoehr's formal referral in

August 2005 are viewed as the triggering event for purposes of the evaluation, then the School

District was well within the 90-day time frame. Unlike the situation in *Fayette County*, where the

school district declined to evaluate for over two years despite "severe academic problems," the

School District here forwent an evaluation for a period of less than six months, during which time

interventions were being implemented consistent with Ohio law and Timothy was experiencing

academic success.

Based on an independent review of the record, the Court concludes that a preponderance

of evidence supports the finding that the School District did not overlook clear signs of disability

or act negligently in failing to order testing of Timothy, nor is there the absence of a rational

justification for not deciding to evaluate immediately and exercising interventions instead. Further,

even if there was a procedural violation here, (*i.e.*, five days late on holding the IEP meeting), that

violation did not seriously infringe upon the Hupps' opportunity to participate in the IEP process

and, thus, does not constitute a substantive violation of the IDEIA.

        b.    *MFE Meeting*

Plaintiffs next contend that the School District did not appropriately advise Mr. and Ms.

Hupp of the combined MFE and IEP meeting of August 29, 2005. Ms. Hupp was notified a day

or two before the meeting. The School District did not provide written notice of the planned

evaluations and meeting. Irrespective of whether the Hupps were formally advised of the meeting,

the record demonstrates that Ms. Hupp did, in fact, attend the meeting and actively participated.

Even if notice of the meeting was procedurally deficient, it brought about no substantive harm to Timothy or his parents and did not infringe upon the Hupp's opportunity to participate in the IEP process.

c. *Advising Parents of IDEIA Rights*

Plaintiffs assert that the School District did not timely advise Mr. and Ms. Hupp of their rights under the IDEIA, and thus violated the procedural component of the Act.    Ms. Hupp testified that she did not receive information regarding her rights under the IDEIA until June, 2006 when the parties were working together on Timothy's IEP for that school year. During the due process hearing, however, Ms. Anderson recalled giving Ms. Hupp a copy of the procedural safeguards booklet at the August 29, 2005 meeting; Ms. Hupp does not remember receiving a copy of that parent handbook. (Tr. 26, 281-82, 285, 897.) The box on Timothy's 2005-2006 IEP signifying parental receipt of the booklet, however, was checked. (Def's Exh. 12.)   Ms. Hupp signed this form.

Upon an independent review, the Court concludes that the factual finding that Ms. Anderson gave a copy of the handbook "Whose IDEA is This?" to Ms. Hupp at the August 2005 meeting is supported by the preponderance of the evidence of record. The IHO implicitly resolved the conflicting testimony, and credited Ms. Anderson's recollection, and the SLRO deferred to these credibility findings. Plaintiffs do not contend that other non-testimonial or extrinsic evidence in the record justifies a contrary conclusion, and, in fact, the checked receipt box on the IEP corroborates the conclusion. The Court has no basis to overturn this determination and perceives no procedural violation of the IDEIA as it relates to advising Timothy's parents of their procedural rights under the Act.

-25-

    d.  *Consent to Revoke Special Education Services*

  Plaintiffs allege that the School District did not obtain informed consent for the revocation

of special education services in September 2005. They assert that Mr. Koslik encouraged Ms.

Hupp to withdraw and home school Timothy. Plaintiff contends that the consent was defective

because it was premised on the School District's purportedly failed promise to provide second-

grade curriculum books. Plaintiffs also suggest that Ms. Hupp's consent was defective because,

some time after she signed the release during a face-to-face meeting with Mr. Koslik, Mr.

Schumacher placed his own signature and obtained the signatures of additional IEP team members,

Constance Brady and Catherine Anderson.

  The record contains no evidence that the later-applied signatures impacted Ms. Hupp's

consent to revoke the School District's special education services, and Plaintiffs provide no

support for the proposition that her consent was less informed under these circumstances. Nor,

in the Court's view, does the conflict about whether Timothy could or should return to school in

January 2006 impact the analysis of whether Ms. Hupp's consent was informed three months

earlier, in September 2005.

  As defined by the IDEIA, "consent" means –

(a)  The parent has been fully informed of all information relevant to the
    activity for which consent is sought, in his or her native language, or
    through another mode of communication;
(b)  The parent understands and agrees in writing to the carrying out of the
    activity for which his or her consent is sought, and the consent describes
    that activity and lists the records (if any) that will be released and to whom;
    and
(c)  (1)  The parent understands that the granting of consent is voluntary on
      the part of the parent and may be revoked at any time.
    (2)  If a parent revokes consent, that revocation is not retroactive (i.e.,
      it does not negate an action that has occurred after the consent was

given and before the consent was revoked).

(3)     If the parent revokes consent in writing for their child's receipt of special education services after the child is initially provided special education and related services, the public agency is not required to amend the child's education records to remove any references to the child's receipt of special education and related services because of the revocation of consent.

34 C.F.R. § 300.9(a). With respect to consent to withdraw special education services, the IHO found that the School District did not coerce the Hupps into home schooling Timothy and that Ms. Hupp was already considering home schooling him when the school year began. These finding are supported by ample evidence. The record is undisputed that Ms. Hupp removed Timothy from school of her own volition.

Plaintiffs have failed to cite to anything in the record to support their assertions that representatives of the School District coerced the decision to withdraw Timothy in favor of home schooling or that Ms. Hupp's consent to revoke special education services in September, 2005 was anything less than informed. Because the Court finds that Ms. Hupp knowingly revoked consent for the continued provision of special education and related services, the Court finds no procedural violation of the IDEIA in this regard.

e.     *Books for Home Schooling*

The School District failed to provide all of the school books used in the second grade curriculum to Ms. Hupp after she began home schooling Timothy. The School did not provide the "decodable readers" that the other second grade teachers received. Plaintiffs allege that this failure amounted to a procedural violation of the IDEIA.

The Code of Federal Regulations provides as follows:

If a parent of a child who is home schooled or placed in a private school by the parents at their own expense does not provide consent for the initial evaluation or

-27-

the reevaluation . . . , the public agency may not use the consent override
procedures. . . ; and [t]he public agency is not required to consider the child as
eligible for services. . . .

34 C.F.R. § 300.300(d)(4)(i)-(ii). Plaintiffs point to no authority in the statutes or case law to

support a claim that the IDEIA covers a home-schooled child who has been withdrawn from

district by a parent after revoking consent for special education services. The Court agrees with

the administrative conclusions that whether the School District failed to provide all of the

textbooks they offered to Ms. Hupp is irrelevant to the issue of the school's obligation to provide

a FAPE after Timothy's withdrawal. Providing many, but not all the books did not cause a failure

of a FAPE for Timothy. Plaintiffs provide no evidence from the administrative record to warrant

overturning these findings.

     f. *Additions to the 2005-2006 IEP*

   Plaintiffs allege that the School District illegally added to the 2005-2006 IEP without notice

to Timothy's parents and without their participation. Two additional pages related to speech

pathology and goals were added to the original IEP in December 2005 or early January 2006 while

Timothy was being home schooled. The administrative officers found that these pages were added

by the School District in anticipation of Timothy's return to school. Timothy's speech goals were

not finalized at the beginning of the school year in 2005 because Timothy was withdrawn from

school after two weeks of class. After Ms. Hupp inquired of DeeDee Dransfield regarding placing

Timothy back in school beginning in January, Ms. Dransfield contacted Larry Koslik regarding

the omission of speech and language goals from the original evaluation team report. The School

District therefore prepared those goals in advance of Timothy's anticipated return to school in

January. Timothy did not return to the School District, however, until the following Autumn.

Under these circumstances, Plaintiffs have failed to demonstrate how the additional pages, which were added without their knowledge, denied Timothy a FAPE or caused substantive harm to him or his parents.

In sum, the Court concludes that, even if the events complained of rise to the level of procedural violations, such inadequacies were *de minimis* and did not "seriously infringe upon the parents' opportunity to participate in the IEP process." *Knable*, 238 F.3d at 765 (citations omitted). Thus, the Court finds that the School District adhered to the procedural requirements of the IDEIA.

### 2.    Substantive Violations

Plaintiffs allege that the School District committed the following substantive violations of the IDEIA: (1) denied Timothy a FAPE for the 2005-2006 school year because the IEP failed to provide qualified teachers or service providers, accommodations to meet Timothy's unique needs, present levels of performance or measurable goals and objectives, and did not assign a one-on-one aide; (2) even though inappropriate, the School District did not comply with the 2005-2006 IEP; and (3) denied him a FAPE for the 2006-2007 school year because the IEP failed to provide for a one-on-one aide.

To provide a FAPE to a disabled child, the IEP must be tailored to confer a "meaningful educational benefit." *Deal,* 392 F.3d at 862. Parties challenging an IEP have the burden of proving by a preponderance of the evidence that the IEP devised by the school district is inappropriate. *Id.* (citations omitted). "The 'preponderance of the evidence' language in the [IDEIA] 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Thomas v. Cincinnati*

*Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990) (quoting *Rowley*, 458 U.S. at 206).

a.     *IEP for 2005-2006 School Year*

Plaintiffs maintain that the School District failed to provide Timothy a FAPE for the 2005-2006 school year because the IEP did not discuss his present levels of performance or measurable goals and objectives, it did not place qualified teachers or service providers to meet his unique needs, and did not assign a one-on-one aide.

The IHO found that the IEP contained goals, objectives, and benchmarks and "provided for monitoring of academic progress." (IHO Finding of Fact #17). Also, the "materials and resources to be utilized" in addressing these goals "were specified" in the IEP itself. (*Id.*) Plaintiffs did not appeal these findings to the SLRO. Furthermore, the Court's independent review of the IEP confirms that it does contain a discussion of Timothy's present level of performance and outlines individualized annual and short-term objectives and goals, as well as the means to measure his progress and achieve these goals.

Plaintiffs characterized the School District's failure to provide a one-on-one aide as the "crucial failure" of the 2005-2006 IEP. (Mem. in Opp., at 29). Plaintiffs rely heavily on the fact that the School District provided one-on-one aides for other students at the same school. The IDEIA, however, does not require school districts to provide the same services to all students with disabilities. Rather, the statute specifically dictates that educational decisions for special education students must be individualized to fit each child's unique situation. 20 U.S.C. § 1414(d). The Court cannot determine whether Timothy's IEP was appropriate based on the IEPs of other disabled students. Whether such children received a one-on-one aide has no bearing on the analysis of whether Timothy's IEP was tailored to meet his unique needs. Drawing these

-30-

conclusions based on such unmerited comparisons would obviate the requisite individual inquiry that lies as the very foundation of the IDEIA.

Plaintiffs emphasize that the witnesses with the most expertise on the subject of Asperger's Syndrome, including Dr. Muir, Dr. Henninger, Dr. Butter, and Lynn Dudek, testified at the due process hearing that Timothy "would benefit" from a one-on-one aide. The issue before the Court, however, is not whether Timothy would benefit from a particular methodology. The Court must assess whether a one-on-one aide was necessary to provide Timothy with a FAPE.

Members of Timothy's IEP team, who were professional educators, responsible for the creation of his IEP, observed him in the classroom environment, had adequate background, experience and training to assess his condition and to formulate program to meet his needs. They considered the opinions of Timothy's medical and psychological providers. They opined that a full-time dedicated one-on-one aide would deflect from the goal of promoting independence for Timothy. The IDEIA does not require school districts to consult with outside experts or to adopt their recommendations. The failure to do so does not automatically constitute a serious deficiency in the IEP. *Renner v. Bd. of Educ. of the Public Sch. of the City of Ann Arbor,* 185 F.3d 635 (6th Cir. 1999) (holding that school district's failure to consult with the plaintiff's expert or to adopt the number of hours she recommended for a particular therapy did not render the IEP substantively deficient). Under the regulations to the IDEIA, decisions regarding a student's educational program and placement must be made by a team of educators and the student's parents. 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.324. Nothing in the statute or regulations requires the team to adopt the recommendation of a student's private physician or psychologist.

The hearing officers at the administrative level concluded that the provision of a one-on-

-31-

one aide was not necessary to provide Timothy with a FAPE. (IHO Conclusion of Law #23; SLRO Decision p. 8). "Since an 'appropriate' public education does not mean the absolutely best or 'potential-maximizing' education for the individual[,] a court's review must focus primarily on the District's proposed placement, not on the alternative that the family preferred. The proposed placement must be upheld if it was reasonably calculated to provide [the disabled child] with educational benefits." *Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495, 505 (6th Cir. 1998). Even though the School District did not adopt wholesale the opinions of some outside providers to have a full-time aide, a preponderance of the evidence supports the determination that the School District offered Timothy a FAPE by including in his IEP provisions for a classroom aide who would be one-on-one with him during unstructured times to facilitate social interaction.[20]

              b.    *Compliance with the 2005-2006 IEP*

Plaintiffs also contend that the School District honored neither the letter nor the spirt of the 2005-2006 IEP. The record demonstrates, however, that the School District implemented the services identified and described in the IEP, as well as additional accommodations that the parties

---

[20]      Plaintiffs also suggest that the School District predetermined whether or not Timothy would be provided with a one-on-one aide. This assertion, however, is not supported by evidence in the record. Even if they had presented evidentiary support, Plaintiffs' reliance on *Deal v. Hamilton Cty. Bd. of Educ.,* 392 F.3d 840 (6th Cir. 2004) as authority for their position that the School District predetermined Timothy's need for an aide is misplaced. The court in *Deal* held that a school district's predetermination of a child's placement deprives the student's parents of meaningful participation in the IEP process, causing substantive, procedural harm and therefore deprives the student of a FAPE. *Id.* at 858. In *Deal*, the school district maintained a policy of refusing to consider a particular methodology for students with autism, and school personnel consistently attended IEP meetings having pre-selected the district's program regardless of the individual needs of the child. *Id.* at 855. In this case, Plaintiffs present no evidence to show that the School District pre-decided that Timothy would not have a full-time aide, or that the District had a policy to do so. Plaintiffs, in fact, acknowledge that the School District does not have a policy of automatically refusing one-on-one aides for special education students because this service was provided to other students. Furthermore, the School District afforded Ms. Hupp full participation in Timothy's IEP meetings.

discussed at the August 2005 IEP meeting. Ms. Ackerman gave Timothy preferential seating, used a handout from Dr. Muir with him, and tried social stories on a one-to-one basis and with the class as a whole to demonstrate the difference between appropriate and inappropriate behavior. Lisa Gallagher worked with Timothy 15 minutes each day instructing him with respect to social skills, using social stories, puppets, play dough and stickers. Ms. Anderson intervened with Timothy's inappropriate behavior at least once, and observed Timothy in the classroom each day in preparation for the development of a behavioral plan. Plaintiffs have pointed to no contrary evidence in the record which would indicate that the School District failed to comply with the IEP.

Plaintiffs' chief argument regarding the School District's compliance with the 2005-2006 IEP relates to Ms. Ackerman's disciplinary method of having students stand on a map of the United States during recess if they misbehaved. Plaintiffs contend that this form of discipline violated the agreed-upon terms of the IEP. Plaintiffs, however, have not demonstrated that this form of discipline deprived Timothy of a FAPE. Both the IHO and the SLRO were aware that Ms. Ackerman used this technique, and, considering this fact, concluded that the 2005-2006 IEP provided Timothy with a FAPE. Administrative findings in an IDEIA case may be set aside only if the evidence "is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilvich,* 208 F.3d at 567. Here, the testimony during the due process hearing revealed that Timothy stood on the outside map during recess approximately five times. Ms. Stoehr observed Timothy on the map, once for a period of time she estimated to be 15 minutes. Ms. Ackerman, however, testified that she imposed this discipline on Timothy only a few times, likely for only 5 minutes, and no more than 10. (Tr. 65, 66, 89, 93-95.) Plaintiffs

provide no evidence from the record and no legal authority that suggests this form of discipline during recess deprived Timothy of a FAPE. Accordingly, this Court finds no basis to draw this conclusion based on its review of the record as a whole.

      c.    *IEP for 2006-2007 School Year*

Plaintiffs also assert that the School District denied Timothy a FAPE for the 2006-2007 school year because the IEP failed to provide for a one-on-one aide. Instead, the IEP proposed by the School District provided for a trained one-on-one aide for Timothy during unstructured times to facilitate social interaction. Ms. Hupp objected to the IEP because the School District would not dedicate a qualified one-on-one aide, and refused to sign it.

Ms. Hupp has never given her consent to the 2006-2007 IEP. The School District offered to implement the parts of the IEP to which she had no objection, but Ms. Hupp has never agreed or consented. Plaintiffs, thus, have no basis to object to any implementation issues because parental consent is required before a School District is permitted to carry out the terms of an IEP. 20 U.S.C. § 1414(a)(1)(D)(ii)(II) ("If the parent of such child refuses to consent to services under clause (i)(II), the local educational agency shall not provide special education and related services to the child . . . ."); 34 C.F.R. § 300.300(b) (same).

Moreover, as described above, Plaintiffs have no absolute right to the provision of a one-on-one aide for Timothy, even though some of his medical providers recommend the service. The IDEIA does not require an IEP to adopt the recommendations of a student's providers. The record does contain evidence that Timothy's outside providers recommended a one-on-one aide, and that the members of his IEP team were familiar with those recommendations. The School District, however, relied on the opinions of the professionals with expertise in autism who actually

observed Timothy in the classroom prior to making recommendations regarding the use of an aide.[21]

This Court's focus remains on the proposed IEP and whether it was reasonably calculated to provide Timothy with educational benefits. "[O]nce a court determines that the requirements of the Act have been met, questions of [educational] methodology are for resolution by the States." *Rowley*, 458 U.S. at 208. In enacting the IDEIA, Congress left primary responsibility for choosing the educational methods most suitable for a disabled child's needs to local educational agencies, with cooperation from the parents. Parents, however, have no right to compel a specific program or methodology. *Tucker*, 136 F.3d at 505 (citing *Lachman v. Illinois St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988)). The IDEIA requires that, "[t]o the maximum extent appropriate," children with disabilities be educated in the least restrictive environment with nondisabled children. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114. The IEP meets this requirement, as it is designed to be implemented in a regular classroom with the assistance of aides. It sufficiently provides access to specialized instruction and related services which are individually designed to provide a meaningful educational benefit, gauged in relation to Timothy's potential. Moreover, a key consideration under the IDEIA is to foster self-sufficiency in disabled children. *See Rowley*, 458 U.S. 176 n.23. These standards, along with the admonishment that the primary responsibility for formulating the education to be accorded to the disabled student and

---

[21]     Plaintiffs fault Ms. Dransfield's testimony that she would not "automatically" support the need for an aide before she had seen any of Timothy's educational records. This statement, in the Court's view, does not diminish her ultimate conclusion, after she had fully evaluated and observed Timothy, that a full-time aide would be too restrictive and would not promote Timothy to exercise necessary independence. Moreover, to the extent Plaintiffs object to Ms. Anderson's testimony as simply "not credible" because she was pre-disposed to be hostile towards the Hupps, they have failed to support their suspicions of animus by a preponderance of the evidence.

for selecting the educational method most suitable to the child's needs must be left to the local agencies in cooperation with the parents compels the Court to conclude that the omission of a full-time aide to Timothy in 2006-2007 IEP did not deprive him of a FAPE. The School District, therefore, did not violate the IDEIA in this regard.

In summary, the Court concludes that the School District has provided access to specialized instruction and related services that are individually designed to provide a meaningful educational benefit to Timothy, and complied with both the substantive and procedural components of the IDEIA. The School District, accordingly, is entitled to judgment on the administrative record. Thus, the School District's Motion for Judgment on the Administrative Record is **GRANTED**.

**B.    Motion for Summary Judgment on Statutory Claims**

> **1.    Child Neglect Complaint to Madison County Department of Job and Family Services ("MCDJFS") and Animus Towards Ms. Hupp**

The Court turns first to address an evidentiary issue raised by the Plaintiffs that permeates all aspects of this case. Plaintiffs devote a significant portion of their Complaint, discovery memoranda, and Memorandum in Opposition to Defendants' Motion discussing the School District's purported animus towards Ms. Hupp, and their contention that this preexisting hostility toward her negatively impacted the District's treatment of Timothy. Moreover, Plaintiffs place substantial emphasis on the MCDJFS complaint of child neglect in an attempt to demonstrate that the School District caused it to be made because officials harbored ill-will against her.[22]

---

[22]    Presumably these matters relate to Plaintiffs' statutory claims in Counts II through IV of their Complaint because Plaintiffs rely on deposition testimony and other materials outside the administrative record. Moreover, because the SLRO affirmed the IHO's decision to exclude matters of animus as irrelevant to the determination of whether Timothy had received a FAPE, these issues would not be an aspect of the Court's review of the administrative record. As such, the Court analyzes Defendants' assertions under the summary judgment standard of Federal Civil Procedure Rule 56.

Plaintiffs have not advanced any evidence to demonstrate that representatives of the School District filed, or caused to be filed, the complaint of child abuse or neglect against the Hupps.[23] Plaintiffs speculate that Larry Koslik, the District's Special Education Supervisor, was involved because Mr. Koslik's brother-in-law was the director of MCDJFS at the time the complaint was made. They further infer that because the building principal, Sam Schumacher, acknowledged a negative history with Ms. Hupp that he either made the report himself or caused it to be made. Plaintiffs even assert that Mr. Schumacher "admitted" he may have been the one who caused the investigation. Plaintiffs also suggest that timing of the complaint is suspicious because it was made "soon after" they attempted to enforce their rights under the IDEIA.

The report to MCDJFS was made on October 27, 2005. According to Ms. Hupp, the complaint alleged that her house was always dirty and glass was all over the floor. (Tr. 601.) No evidence, however, suggests that anyone from the School District ever visited or saw the Hupp's home so as to make this observation. And, Ms. Hupp had removed her son from school over six weeks prior to the investigation of the child welfare complaint. Although temporal proximity alone can suffice to establish retaliatory intent, in those instances, the temporal proximity between an individual's knowledge of protected activity and an adverse action is "very close." *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (reviewing claim of employment discrimination under Title VII, 42 U.S.C. § 2000-e(3)(a)); *see also DiCarol v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) ("[I]in certain distinct cases where temporal proximity between

---

[23]     According to this Court's September 8, 2008 Order, after an *in camera* review of MCDJFS' confidential documents related to the complaint, there is "no information whatsoever that would permit plaintiffs to identify the person or persons who made the complaint." (Order, Sept. 8, 2008, Doc. #78.)

the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.") The Court need not decide whether six weeks is "very close" in temporal proximity to Plaintiffs' exercise of their statutory rights because, more fundamentally, Plaintiffs have adduced no evidence, beyond their own speculation, that the School District had any involvement with the filing of the complaint.

Plaintiffs questioned Mr. Koslik, Mr. Schumacher, and two other individuals, under oath about the MCDJFS report at the due process hearing, and, after initiating this lawsuit, conducted extensive depositions of numerous School District employees. All of this cross-examination disclosed no link between the District and the MCDJFS investigation. During the hearing, and later in their depositions, representatives from the School District, instead, categorically denied that they had anything to do with the child neglect complaint.

Plaintiffs point to the deposition testimony of Samuel Schumacher, the school principal, and suggest that he admitted that he "may in fact have been the one who caused an investigation to be made against Ms. Hupp." (Mem. in Opp., at 3.) The portion of Mr. Schumacher's deposition upon which Plaintiffs rely, however, reveals that he testified only that he "may have" spoken to children's services about attendance issues, as he regularly talked to MCDJFS about student attendance problems, although he did not recall doing so with respect to Timothy.[24]

---

[24] Mr. Schumacher testified that he sometimes had communication with MCDJFS regarding children in his school with attendance issues. (Schumacher Dep., at 16-17.) He said that common practice in the school district would be to make a referral to MCDJFS after a child had missed a certain number of school days. Mr. Schumacher testified that he could not recall talking to MCDJFS about Timothy at all, but if he did, it would have been about attendance. (*Id.* at 18-20.)

Indeed, Mr. Schumacher repeatedly testified that he had no idea who initiated the complaint.[25]

Drawing all reasonable inferences in favor of Plaintiffs, the Court concludes that no genuine issue

exists as to any material fact related to this matter, and that no reasonable jury could return a

verdict in favor of Plaintiffs as to their claim that representatives from the School District caused

a baseless child abuse complaint to be filed against them.

Similarly, the Court finds that Plaintiffs' assertion that Mr. Schumacher and Ms. Anderson

harbored animus towards the Hupps is, in the first instance, not supported by the evidence.

Plaintiffs again speculate that Mr. Schumacher and Ms. Anderson were hostile towards them, but

provide no more than their own supposition to support their theory. Moreover, Plaintiffs have

failed to demonstrate how this alleged animus is probative of their claims against the School

District. Absent some evidence of actual animus and a causal link to their claims, the Court

cannot conclude that these individuals retaliated against Plaintiffs. Plaintiffs, as the non-moving

party in this case, must "do more than simply show that there is some metaphysical doubt as to

the material facts." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). "Where

the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the

motion should be granted. The trial court has at least some discretion to determine whether the

respondent's claim is 'implausible.'" *Id.* at 1480 (citations omitted).

In sum, to the extent that Plaintiffs rely on the MCDJFS's complaint as evidence of animus

---

[25]    Mr. Koslik testified at his deposition that, in January 2008, his brother-in-law, the former Director of MCDJFS, revealed the identity of the individual who made the complaint, and it was not someone employed by, related to or involved with the School District. The Court views this information as inadmissible hearsay under Rule 56, and declines to rely on it in rendering its decision here. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 61 (1987) (recognizing strong public interest in maintaining confidentiality of official records concerning child abuse); Ohio Rev. Code § 5153.17.

towards Ms. Hupp and her family, or as proof that the School District retaliated against them in their attempts to enforce Timothy's rights to a free and appropriate public education or in any other manner, they have failed to support such a claim beyond their suspicions and speculations. Similarly, Plaintiffs have not adduced any evidence to support their personal beliefs that Mr. Schumacher and Ms. Anderson harbored animosity towards them. Plaintiffs cannot, therefore, rely on these unproven matters as evidence to support their statutory claims. *See Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004) ("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his or her] favor on more than mere speculation, conjecture, or fantasy." (internal quotations omitted)).

### 2.   Statutory Claims - Generally

In Count II, Plaintiffs allege that Timothy is a disabled person within the meaning of the Rehabilitation Act and was entitled to a FAPE, but that the School District failed to accommodate his disability or provide special education and related aids.[26] In Count III, Plaintiffs allege that Timothy is a disabled person for purposes of the ADA, and again assert that the School District denied him a FAPE in violation of that statute. In Count IV, Plaintiffs allege, *inter alia*, that the School District, acting under color of state law, deprived them of their federally guaranteed rights under the IDEIA, the Rehabilitation Act, and the ADA.[27] Insofar as Plaintiffs' Complaint alleges

---

[26]    Plaintiffs also allege that the School District retaliated against Timothy and Ms. Hupp in violation of the Rehabilitation Act for engaging in the protected activity of attempting to enforce his rights to a FAPE. That assertion is addressed below.

[27]    Again, Plaintiffs allege additional violations of Section 1983, which the Court addresses separately below.

that the School District violated Timothy's rights under these statutes by failing to provide him with a FAPE, the claims fail because, as the Court has already determined, the School District did not deny Timothy a FAPE. Resolution of the IDEIA claims necessarily resolve the statutory claims based upon the same allegations. *See Soraruf v. Pinckney Cty. Schs.*, No. 98-2052, 2000 WL 245501 *4 (6th Cir. 2000) (per curiam) (finding that because school district did not violate plaintiff's right to a FAPE, it did not violate rights under Rehabilitation Act, ADA or Section 1983). The Court next turns to the other facets of Plaintiffs' statutory claims.[28]

### a. *Section 504 of the Rehabilitation Act*

In Count II, under Section 504 of the Rehabilitation Act, Plaintiffs allege that the School District retaliated against them for attempting to enforce his rights to a FAPE.[29] To state a *prima facie* claim of retaliation under the Rehabilitation Act, a plaintiff must prove four elements: (1) she engaged in legally protected activity; (2) the defendant knew about the plaintiff's exercise of this right; (3) the defendant subjected her to adverse action, and (4) a causal connection exists between the protected activity and the adverse action. *Gribcheck v. Runyon*, 245 F.3d 547, 550

---

[28]  In their Motion for Summary Judgment on Plaintiffs' statutory claims, Defendant refers several time to the pleading standards for motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and fault the Plaintiffs for purportedly providing no more than a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. *Twombly* and its progeny, including *LULAC v. Bredesen*, 500 F.3d 523 (6th Cir. 2007), also cited by Defendants, have no application outside the context of pleading standards, and do not affect a district court's analysis of claims for summary judgment purposes under Rule 56.

[29]  Plaintiffs presumably seek to assert a claim for retaliation under Section 504 because they mention it only in their statement of their claim under Count II. In their Memorandum in Opposition, however, Plaintiffs rely on wholly inapposite cases involving Title VII sexual harassment, malicious prosecution, and retaliation under Section 1983 for exercising rights under the First Amendment. Regardless of which theory Plaintiffs intend to pursue, proof of retaliation under Section 504, the ADA and Section 1983 generally share the same legal elements and require identical showings.

(6th Cir. 2001). To establish the necessary causal connection, Plaintiffs must proffer sufficient evidence "to raise the inference that [the] protected activity was likely the reason for the adverse action." *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990).

Assuming without expressly holding that Ms. Hupp engaged in protected activity and the School District was aware that she was so engaged, Plaintiffs have not demonstrated that the School District took adverse action against her or her family. If Plaintiffs are suggesting that the adverse action was initiating the child welfare investigation, as set forth above, Plaintiffs have not shown sufficient evidence that someone from the School District contacted MCDJFS. In their discussion of their Rehabilitation Act claim, Plaintiffs recite the allegations from Paragraph 23 of their Complaint, and contend that genuine issues of material fact exist as to whether the School District failed to accommodate Timothy and retaliated against him and his family. Of course, a non-moving party may not rest on the pleadings, but must present probative evidence in support of the complaint to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In all events, as the Court reads Plaintiffs' Complaint and Memorandum in Opposition, their claim under Section 504 is limited: Plaintiffs assert that the School District violated Section 504 by discriminating against Timothy when it failed to provide him a FAPE, and by retaliating against the Hupps by filing a baseless complaint with children's services. Although Defendant has briefed many bases upon which the Court should reject Plaintiffs' claims, the Court declines to explore the nuances of a potential Section 504 claim that Plaintiffs apparently have not asserted.

For these reasons, Defendant's Motion for Summary Judgment on Plaintiffs' Rehabilitation Act claims is **GRANTED.**

-42-

      b.    *ADA*

In Count III, Plaintiffs allege that the School District violated Timothy's rights under the ADA. Under the terms of the statute, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Plaintiffs point to no facts that would distinguish their claim under the ADA from their FAPE claim under the IDEIA. For reasons set forth above, Plaintiffs have not adduced sufficient facts to show that Timothy was excluded from participation or denied the benefits of a School District service based on a failure to provide a FAPE. Defendant's Motion is therefore **GRANTED** as it relates to Plaintiffs' claims under the ADA.

      c.    *Section 1983*

In addition to their assertion that someone from the School District wrongfully caused an abuse and neglect investigation under the State of Ohio's child welfare laws to be direct against Timothy's parents, Plaintiffs allege in Count IV that the School District has a custom or practice of making educational decisions in an arbitrary, subjective manner, based upon "who you are," or "who you know," as opposed to the unique needs of the child as required by law. They assert that the "normal remedies under the IDEA are inadequate to compensate plaintiffs for the harm that they have suffered . . . ." (Compl., ¶ 32.)

Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . .

42 U.S.C. § 1983. Section 1983 itself creates no substantive rights, but merely provides a mechanism for aggrieved persons to obtain a remedy for deprivations of rights established elsewhere. *E.g., Gonzago University v. Doe*, 536 U.S. 273, 285 (2002). Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998).

A governmental entity may be held liable under Section 1983 only if it causes the alleged constitutional violation.[30] *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). The doctrine of *respondeat superior* does not apply and a governmental entity cannot be held liable under Section 1983 based solely upon allegations that an employee or agent inflicted an injury. *Id.* at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. The Sixth Circuit has held that "to satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the city itself and show that particular injury incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993).

Again, to the extent Plaintiffs assert that the School District violated Section 1983 by depriving them of their rights under the IDEIA, Section 504 and the ADA, as the Court has already concluded, Plaintiffs cannot show a deprivation of rights under those statutes. If,

---

[30]     Defendant notes that the School District is not a property party to this suit, but rather Plaintiffs should have named the Switzerland of Ohio Local Board of Education because only that body may sue and be sued under Ohio law. Section 1983 claims are viable against governmental bodies, such as a board of education. *See, e.g., Board of County ComMs. v. Brown*, 520 U.S. 397 (1997) Defendant, however, does not move for judgment on this basis, and proceeded to address the merits of Plaintiffs' claims. The Court detects no prejudice from this procedural inadvertence.

-44-

however, Plaintiffs claim under Section 1983 regarding the School District's purported custom and policy of making arbitrary and subjective educational decisions based on "who you know" is construed as an independent constitutional tort, separate from their statutory claims under the IDEIA, the ADA and the Rehabilitation Act, Plaintiffs offer no more than a scintilla of evidence in support of their claim. While Plaintiffs offer evidence that Mr. Koslik, Mr. Schumacher and Ms. Ackerman each have relatives working within the School District, they have not shown that these relationships support their claim that educational decisions were made arbitrarily. Further, no evidence supports Plaintiffs' suggestion that the School District was protecting Ms. Ackerman because her husband was the superintendent, particularly because Mr. and Ms. Ackerman had divorced before the events giving rise to this lawsuit. Plaintiffs' contention that the School District would not investigate Ms. Hupp's claims of abuse against Ms. Ackerman is also erroneous. The School District held a meeting on September 15, 2005 to address these concerns. At that time, school had been in session only two weeks. The School District could not pursue the issue further because Timothy was removed from school after that meeting. Plaintiffs have not demonstrated that genuine issues of material fact exist with respect to whether the School District violated Section 1983 with a policy of arbitrary, "who you know" educational decision-making.

Accordingly, Defendant's Motion for Summary Judgment as it relates to Plaintiffs' Section 1983 claim is **GRANTED**.

### IV.

For the foregoing reasons, Defendant's Motion for Judgment on the Administrative Record is **GRANTED**; Defendant's Motion for Summary Judgment is **GRANTED**. (Doc. #77.) The

Clerk is directed to enter judgment in favor of Defendant.[31]

**IT IS SO ORDERED.**


_12-11-2012_
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

      [31]    Given the disposition of this case, the Court does not address Plaintiffs' various supplemental briefs regarding additional "other acts" evidence under Federal Evidence Rule 404(b) and Defendant's corresponding Motion to Strike. The Court notes, however, that in arriving at the conclusions in this Opinion and Order, it did not rely on the additional evidence Plaintiff purported to bring with its Federal Rule of Evidence 404(b) briefing. To do so would violate the Court's obligation to supplement the administrative record only with "what is necessary for consideration of the original IEP was reasonably calculated to afford some educational benefit." *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840m 850 (6th Cir.2004) (citations omitted). The Court notes that Plaintiffs' Motion is not made, nor could it be, under Fed. R. Civ. P. 56(f), which a party may invoke to postpone a ruling on a motion for summary judgment if the non-movant demonstrates that it may, through discovery, rebut the movant's initial demonstration of an absence of a genuine issue of material fact. Plaintiffs made no such argument, and in fact, fully responded to Defendants' dispositive motion. Furthermore, the Federal Rules of Civil Procedure do not compel the Court to permit supplemental briefs on dispositive motions. Whether such briefs are permitted or rejected is entirely within the discretion of the Court. *LeBeau v. Lembo Corp.*, 2008 WL 4279568 (N.D. Ohio, 2008). "The Federal Rules of Civil Procedure do not require a district court to allow amendments to a motion," but rather "a district court has discretion to grant or deny such amendments." *Id.* at *1 (citing Fed. R. Civ. P. 7, and 5 Wright and Miller, Federal Practice and Procedure § 1194 (3d ed. 2004)).